IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                           No. 10-CR-03101 MCA

MARTIN AGUILAR,

        Defendant.

<u>**ORDER DENYING MOTION TO SUPPRESS EVIDENCE**</u>

        This matter is  before the Court upon Defendant's *Opposed Motion to Suppress* [Doc. 14]. The Court has considered the written submissions of the parties, the exhibits tendered by the parties, the arguments of counsel and the testimony of witnesses at the evidentiary hearing on Defendant's motion, and is otherwise fully advised.

**FINDINGS OF FACT**

        The Court finds as follows:

        On February 12, 2010, United States Fish and Wildlife Service (USFWS) Special Agents Russell Stanford and Jason Riley drove onto  Kewa Pueblo (formerly known as Santo Domingo Pueblo). [Ex. 6  at 2]  The special agents were investigating an anonymous tip that Defendant had killed eagles the previous weekend on tribal lands along the Rio Grande River. [Ex. 6 at 2; Tr. 1/9/11-12; 1/101/1-4][1] The special agents conducted surveillance by the Rio Grande River for about three hours, beginning about 5:30 am or so.  [Ex. 6 at 2; Tr. 1/50/7-8, 21-22] The special agents then drove to Kewa Pueblo government headquarters where, as a courtesy, they

_____

        [1]Citations to the transcript of the evidentiary hearing are in the following format: [day/page/line(s)].

advised tribal officials that they were investigating the illegal taking of eagles. [Ex. 6 at 2; Tr. 1/53/4-6; 1/99/1-4; 1/100/3-6] The special agents asked the tribal officials if they knew anything about eagles being killed. [Ex. 6 at 2-3; Tr. 1/56/12-16]  The tribal officials told the special agents that they had spoken about such a matter with a tribe member, [Ex. 6 at 3; Tr. 1/56/17-18] but they would not identify the tribe member.  [Ex. 6 at 3; Tr. 1/56/20-24]  Special Agent Stanford did not recall telling tribal officials that Defendant already had been identified as the suspect or that he and Special Agent Riley were planning to conduct their investigation in the main village of the Pueblo. [Tr. 1/57/21 to 1/58/1-2]  The special agents were not aware of a tribal policy of assigning a tribal officer as an escort when outsiders were conducting business within the main village of the Pueblo.  [Tr. 1/97/1-7; 2/165/7-17] Since the special agents  had not told tribal officials that they were planning to conduct their investigation within the village, the Governor did  not assign a tribal officer to escort the special agents. [Tr. 1/60/17-18; 1/98/9-11]

The special agents drove into the main village of the Pueblo, [Tr. 1/58/8-10] where they located Defendant's house. [Ex. 6 at 3; Tr. 1/60/12-13]  Defendant's sister and their mother also live in the house. [Tr. 1/115/22-25]  The special agents parked on the street near Defendant's house. [Tr. 1/65/21-23]  They got out of their vehicle and  approached Defendant's house. [Tr. 1/66/3-5; 1/104/6-7]  Special Agent Stanford knocked on the front door.[Tr. 1/66/3-5]  Defendant's sister, Imogene Aguilar, answered the knock. [Tr. 1/66/6-7; 1/110/23-24]  Defendant's mother was also at home. [Ex. 6 at 3;  Tr. 1/9/25]  Special Agent Stanford identified himself as a USFWS special agent, presenting his credentials and badge. [Tr. 1/11/15-18]  The special agents were dressed in casual plainclothes and each was carrying a sidearm, which may

have been visible. [Tr. 1/61/8-9; 1/62/2-4; 1/63/22 to 1/64/20; 1/102/3-8, 13-22]   In any event, Ms. Aguilar did not notice their sidearms. [Tr. 1/115/17-18]   Their vehicle, a pickup truck,  was unmarked and had Mexican license plates. [Tr. 1/65/6-13; 1/103/16-23]   Special Agent Stanford explained to Ms. Aguilar that he wanted to speak with Defendant. [Tr. 1/9/25 to 1/10/1] Ms. Aguilar told Special Agent Stanford that Defendant was not at home [Tr. 1/66/15-17] and that she did not know where he was or when he would be back. [Tr. 1/66/15-17; 1/111 at 1-3]  This conversation took place at the doorway to Defendant's home, with the special agents standing just outside the door.  [Tr. 1/10/18-22]; 1/66/11-14;  1/111/22 to 1/112/3-4] The special agents were courteous and professional.  [Tr. 1/11/19-21]

The special agents returned to their vehicle and left the Pueblo to get refreshments. [Tr. 1/12/6-9; 1/104/21 to 1/105/3]  They drove back to the Pueblo and parked outside Defendant's home. [Tr. 1/12/24 to 1/13/1; 1/67/8-10]  After sitting in the truck for perhaps an hour waiting for Defendant to return, [Tr. 1/67/5-10; 1/111/7] the special agents got out and again approached Defendant's house, once more knocking on the front door.  [Ex. 6 at 3;  Tr. 1/67/16-19; 1/111/9-10]  Once again, Ms. Aguilar answered the knock. [Ex. 6 at 3; Tr. 1/13/12-15; 1/111/9-10] Special Agent Stanford asked Ms. Aguilar if she knew Defendant's whereabouts. [Tr. 1/13/20-21]   He also asked Ms. Aguilar if she knew anything about Defendant's involvement with eagle feathers or killing eagles. [Ex. 6 at 3; Tr. 1/13/22-24; Tr. 1/111/ 14-16]  Ms. Aguilar responded that she had nothing to do with eagles and knew nothing about her brother and eagles.  [Ex. 6 at 3; Tr. 1/13/24 to 1/14/2; 1/111/14-16]  She told Special Agent Stanford that she did not know when Defendant would be back. [Tr. 1/14/3-4]  The special agents did not enter Defendant's home at any time during this second encounter. [Tr. 1/14/8-9; 1/112/14-16]

Special Agent Riley observed a dead hawk in plain view outside the front door to Defendant's house. [Ex. 6 at 3; Tr. 1/19/25 to 1/20/3; 1/105/13-16]  The special agents photographed the hawk and returned to their vehicle to wait for Defendant.  [Ex. 6 at 3;  Tr. 1/68/1-6; 1/105/19-23]

Sometime later–a half hour or so, Ms. Aguilar opened the front door and gestured to the special agents to come over to the house. [Ex. 6 at 3; Tr. 1/15/5-7, 10-11; 1/69/4-6, 10-13; 1/106/1-2, 12-15]  Defendant had called home to get a phone number, [Tr/ 2/203/21-22]  and during the conversation Ms. Aguilar told Defendant that "two new [sic] guys are here to talk to you." [Tr. 1/113/8-9;  2/203/24]  She explained  to the special agents that Defendant was on the telephone and wanted to speak to them. [Ex. 6 at 3; Tr. 1/16/12-14; 1/106/15-17; 1/113/24-25]  She made a gesture, which Special Agent Stanford understood was an invitation for the special agents to come inside the house. [Ex. 6 at 3; Tr. 1/16/5-6; 1/71/12-18]  Ms. Aguilar led Special Agent Stanford back to the kitchen where the dock for the cordless telephone  was located. [Tr. 1/16/23/ to 1/17/1]  Ms. Aguilar returned to the front room;  Special Agent Riley followed her to keep her under observation as a safety precaution. [Tr. 1/107/15-17; 1/107/25 to 1/108/1-2]  As he was standing in the front room, Special Agent Riley made a few remarks about some bear hides and a mounted deer that were in plain view.[2] [Tr. 1/108/5-9]  Back in the kitchen,  Special Agent Stanford, speaking to Defendant over the telephone,  identified himself and explained that he had some questions about eagle feathers. [1/18/7-11; 2/216/1-3]  Defendant told Special Agent Stanford that he was at a Sam's Club in Albuquerque. [Ex. 6 at 3; Tr. 1/18/12-13]  Special

---

[2]The Court finds Ms. Aguilar's testimony that the special agents entered without permission and poked about the kitchen and front room, shining flashlights into dark areas, [Tr. 1/113/25 to 1/114/3; 1/114/15-19; 2/142/13-17, 22-25] to be not credible.

Agent Stanford asked Defendant if he would wait so that Special Agent Stanford could meet him at Sam's Club. [Tr. 1/18/13-14] Special Agent Stanford asked Defendant to wait; he did not order Defendant to wait for him. [Tr. 1/18/18-19; 1/74/18-20] Defendant agreed to wait for Special Agent Stanford, stating that he would meet Special Agent Stanford at the food court. [Tr. 1/18/16-17] Special Agent Stanford turned off the phone, thanked Ms. Aguilar, and he and Special Agent Riley went outside. [Tr. 1/19/5-17]

The special agents left the Pueblo and drove to the Sam's Club. [Ex. 6 at 3; Tr. 1/20/7-8] It took about twenty to twenty-five minutes for them to get from Defendant's home to the Sam's Club. [Tr. 1/20/13-14] They arrived around noon. [Tr. 1/20/20-21] The special agents found Defendant in the food court, sitting with a woman at a picnic-style table. [Tr. 1/20/18-19; 1/21/1, 6-7] Defendant did not feel that he had been forced to wait for Special Agent Stanford. [Tr. 2/213/13-23; 2/214/23-25 to 2/215/1-2] After the special agents introduced themselves and displayed their credentials and badges, [Tr. 1/21/3-4; 2/216/23-24] the woman left to go shopping. [Tr. 1/21/3-4] At no time did either of the special agents represent to Defendant that they were acting on behalf of the tribal government. [Tr. 1/22/24 to 1/23/2; 2/211/15-18] The agents sat down across the table from Defendant. [Tr. 1/21/7-8] They explained to Defendant why they wanted to talk with him–that they had information that he had shot two eagles the previous weekend. [Ex. 6 at 3; Tr. 1/21/18-20; 1/22/10-12; 2/217/3-5] Defendant perceived the special agents as polite and courteous. [Tr. 2/216/15-22] Special Agent Stanford told Defendant that he was not under arrest and that he did not have to speak to the agents and could leave. [Tr. 1/75/10-11; 2/217/8-9] Defendant understood that he was not under arrest. [Tr. 2/217/8-9] At the evidentiary hearing on his motion to suppress, Defendant conceded that he voluntarily spoke

to the special agents. [Tr. 2/218/9-10]   Defendant was very cooperative [Tr. 1/22/21-22] and freely admitted that while chopping wood the previous weekend he had shot one eagle and his son had shot another, using Defendant's .22 magnum rifle. [Ex. 6 at 3; Tr. 1/22/14-16; 2/218/11-20]  Defendant explained that he was a medicine man [Tr. 1/79/22-24; 2/219/16-24] and that the eagles were killed for their feathers.  [Ex. 6 at 3; Tr. 1/22/18-19] Defendant denied killing the hawk that the special agents had observed outside Defendant's house. [Ex. 6 at 4]  Defendant told the agents that he had been called into the tribal Governor's office on February 10, 2010 and questioned about killing eagles. [Ex. 6 at 4; Tr. 1/25/13-19]  He admitted to the Governor that he had killed two eagles. [Ex. 6 at 4; Tr. 1/25/17-18] The Governor told Defendant to stop killing eagles.[Ex. 6 at 4; Tr. 1/25/19]  Special Agent Stanford asked if he could see the feathers. [Tr. 1/24/4-7] Defendant told the special agents that the feathers were in a basket in a workshop behind his house. [Tr. 1/23/21-22]  Defendant also told the special agents that the day after the 2009 Gathering of Nations Pow Wow ended, he traded some jewelry to another Indian for two eagle wings. [Ex. 6 at 4; Tr. 2/220/19-25; 2/221/21-24]  Special Agent Stanford asked Defendant if he would give a written statement. [Ex. 6 at 4]  Defendant dictated a statement, which Special Agent Stanford read back to him.  [Ex. 6 at 4; Tr. 1/24/21 to 1/25/3; 2/224/18 to 2/225/7; 2/226/4-9]  Defendant signed the statement. [Ex. 6 at 4; Ex. 7; Tr. 1/25/3; 2/226/7-9; 2/228/2-15]  The meeting between the special agents and Defendant lasted about an hour.  [Tr. 1/79/10-12]. Defendant and the special agents agreed to meet at Defendant's house at 4:00 pm so that the special agents could examine the eagle feathers. [Ex. 6 at 5;  Tr. 1/80/20-25 to 1/81/3; 2/222/3-8]  Special Agent Stanford thanked  Defendant for his time and he and Special Agent Riley left. [Tr. 1/25/24 to 1/26/3]

The Special agents returned to Kewa Pueblo, arriving at Defendant's house around 3:00 pm. [Ex. 6 at 5; Tr. 1/26/9]  The special agents did not have a warrant authorizing a search of Defendant's house or the seizure of the feathers or other evidence. [Doc. 34 at 5]  Defendant had returned home prior to the special agents' arrival, [Tr. 1/26/17-18; 1/81/16-20; 2/229/2-6; 2/229/25 to 2/230/2] and had moved the eagle feathers and wings from a shed into his house. [Ex. 6 at 5; Tr. 1/27/12-14; 1/29/20-24; 1/30/1-5; 2/148/5-13; 2/229/9-2/230/5]  Someone, either Defendant or Ms. Aguilar,  telephoned the Governor's office to inform tribal officials that two federal agents were at the Aguilars' house. [Tr. 2/168/24-25; 2/182/3-11; /2/224/14-15; 2/236/11-13]  Defendant gestured to the special agents to come over to his house and then led them inside. [Ex. 6 at 5; Tr. 1/27/1-2; 2/230/3-5, 11-13]  At the evidentiary hearing on his motion to suppress, Defendant conceded that he freely and voluntarily invited the special agents into his home to examine the feathers.[Tr. 2/230/11-17]  The special agents observed a basket and a plastic bag containing loose bald eagle feathers, [Ex. 6 at 5; Tr. 1/27/15-16; 1/28/5-7] and two pieces of cardboard on which two golden eagle wings were mounted. [Ex. 6 at 5; Tr. 1/28/1-5]  The special agents asked if they could look inside the shed where Defendant kept the feathers. [Tr. 1/29/24-25; 2/231/4-7]  Defendant responded "no." [Tr. 1/29/24-25; 1/30/14; 2/231/9-11]  Defendant told the special agents that he had telephoned tribal officials and that he wanted to wait for the arrival of  tribal officers before proceeding further.  [Ex. 6 at 5; Tr. 1/28/19 to 1/29/1; 1/82/4-10]   Tribal police officer Kerwin Tenorio[3] arrived within a few minutes. [Ex. 6 at

_____

[3]The Court notes the conflict between the Special Agent Stanford's recollection that two tribal officials arrived together, and the testimony of Officers Tenorio and Vincent Quintana. Officer Tenorio did not mention Officer Quintana being present, and Officer Quintana testified that he arrived *after* the special agents had left the Aguilar residence. [Tr. 2/201/19-25] The Court accepts the specific recollection of Officers Tenorio and Quintana regarding their own

5; Tr. 1/82/16; 2/178/8-11; 2/195/11-16]  Special Agent Stanford discussed the USFWS

investigation with Officer Tenorio. [Ex. 6 at 5]  Officer Tenorio and Defendant conferred in a

native language, presumably Keres. [Ex. 6 at 5]  Officer Tenorio then told the special agents that

they should immediately report to the tribal Governor at his office. [Ex. 6 at 5; Tr. 1/85/15-17]

Special Agent Riley responded that he and Special Agent Stanford would meet at the Governor's

office when they had completed their official business with Defendant. [Ex. 6 at 5]  At some

point, Defendant produced his .22 magnum rifle. [Tr. 2/209/15-19]  Special Agent Stanford told

Defendant that the special agents were going to seize the eagle feathers, the mounted eagle

wings, the hawk carcass, and the rifle. [Tr. 1/86/13-15, 18-20;  1/86/24 to 1/87/1; 2/209/22-23]

Special Agent  Riley filled out a  USFWS Abandonment Form listing the loose bald eagle

feathers, the mounted eagle wings, the hawk carcass, and the rifle. [Ex. 6 at 5]  Special Agent

Stanford explained the form to Defendant, [Tr. 1/86/17] who signed the form. [Ex. 8]  One of the

special agents gave Defendant a copy of the Abandonment Form. [Ex. 6 at 5]  The special agents

then seized the listed items, placing them in plastic bags and taking them to their vehicle.  [Ex. 6

at 5]  The special agents left Defendant's house, explaining that they would be in touch.  [Ex. 6 at

5].

These findings will be supplemented in the following discussion by additional findings

specific to the issue at hand.

_____

actions.

## DISCUSSION AND ISSUES PRESENTED

**1.** **Whether USFWS Special Agents Stanford and Riley Acted in Excess of Their Jurisdiction in Conducting Their Investigation on Kewa Pueblo Lands without the Express, Prior Permission of Tribal Officials**

Defendant's motion requires the Court to decide whether USFWS Special Agents Stanford and Riley acted in excess of their jurisdiction in conducting their investigation into violations of the Bald and Golden Eagle Protection Act on Kewa Pueblo tribal lands without first obtaining permission from tribal officials.   For the following reasons the Court concludes that the answer to this question is "no."

"When a federal law of general applicability  is silent on the issue of applicability to Indian Tribes, . . .  it applies equally to Indians unless: '(1) the law touches "exclusive rights of self-governance in purely intramural-matters" (2) the application of the law to the tribe would "abrogate rights guaranteed by Indian treaties"; or (3) there is proof "by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations."'" *United State v. Fox*, 573 F.3d 1050, 1052 (10th Cir. 2009).  The geographical scope of Bald and Golden Eagle Protection Act is "within the United States or any place subject to the jurisdiction thereof."  16 U.S.C. § 668(a).  "The Eagle Protection Act by its terms prohibits the hunting of the bald or golden eagle anywhere within the United States, except pursuant to a permit issued by the Secretary of the Interior." *United States v. Dion*, 476 U.S. 734, 736 (1986). In *Dion*,  the Supreme Court held that Congress, in enacting the Eagle Protection Act, intended to abrogate tribal treaty rights to hunt bald and golden eagles.  Our Tenth Circuit Court of Appeals has upheld prosecutions of Indians under the BGEPA.  *United States v. Sandia*, 188 F.3d 1215 (10th Cir. 1999);  *United States  v. Friday*, 525 F.3d 938 (10th Cir. 2008). If the

BGEPA did not apply to Indians in the first instance, then Congress' provision of an exception

by regulation for "the religious purposes of Indian tribes" set out in 16 U.S.C. § 668a would be

meaningless. *Dion*, 476 U.S. at 740. The legislative history of this provision expressly refers to

the role that eagles play in the religious ceremonies of Indians in the Southwest. *Id.* at 741-42.

Clearly, Congress intended the BGEPA applies to Indians, including Pueblo Indians. *Id.* at 743

("It seems plain to us, upon reading the legislative history as a whole, that Congress in 1962

believed that it was abrogating the rights of Indians to take eagles.")

16 U.S.C. § 668b(a) provides that "[any employee of the Department of the Interior

authorized by Secretary of the Interior to enforce the provisions of this subchapter. . . may, with

or without a warrant,[4] as authorized by law, search any place." Defendant has not cited, and the

Court has not found, any authority suggesting that a USFWS special agent authorized by

Congress to investigate a violation of the BGEPA "anywhere within the United States" must

obtain the permission of tribal authorities prior to conducting law enforcement activities on tribal

lands. The case that Defendant relies on, *Ross v. Neff*, 905 F.2d 1349 (10th Cir. 1990), is easily

distinguishable as it deals with state law enforcement officers entering Indian Country to enforce

state law, not with federal officers entering tribal lands to investigate Violations of the BGEPA.

This Court concludes that unless an exception applies to limit the nation-wide criminal

jurisdiction of USFWS special agents, the USFWS special agents who entered Kewa Pueblo

lands to investigate a criminal violation of the BGEPA were not required to obtain the prior

permission of tribal officials.

---

[4]Obviously, this statute does not nullify limitations on warrantless searches imposed by the Fourth Amendment.

Defendant argues that a March 2009, "Confidential and Proprietary Information Agreement" between Santa Domingo Pueblo and the USFWS required special agents investigating a possible violation of the BGEPA to obtain tribal authorization prior to entering tribal lands.   The Court is not persuaded that the agreement was intended to apply to federal law enforcement activities or, more importantly, to limit the authority of federal law enforcement agents to investigate criminal violations of federal law on tribal lands. The agreement expressly provides that"[t]his Agreement shall not be construed to grant, expand, create, or diminish any legally enforceable rights, benefits or trust responsibilities, substantive or procedural, not otherwise granted or created under existing law."  "Existing law" of course includes the BGEPA, including 16 U.S.C. § 668b(a). Further, the United States has tendered a copy of a letter dated July 15, 2010 from the Governor of Kewa Pueblo to the USFWS proposing that the Pueblo and the USFWS enter into law enforcement protocols, including a requirement that "[b]efore conducting any investigation or engaging in other law enforcement activity on Kewa Pueblo, the Service will contact the Office of the Governor, in person or by phone." [Ex. 5]  The fact that the Governor of the Pueblo believed it necessary to include such a provision in the proposed law enforcement protocols suggests that Pueblo officials, who presumably were familiar with the March 2009 "Confidential and Proprietary Information Agreement," understood that apart from the proposed law enforcement protocols (which were never accepted by the USFWS[5]), the USFWS was not required to obtain prior authorization from the tribe to conduct law enforcement activities on tribal lands.

_____

[5]The USFWS officer to whom the proposed agreement was addressed did not execute it. It appears that prior to July 2010, the USFWS had concluded that it lacked statutory authority to enter into such cooperative law enforcement agreements with Indian tribes.  [Ex. 3]

The Court concludes that the USFWS agents involved in the investigation of Defendant's alleged taking of protected species acted within their jurisdiction in entering Kewa Pueblo lands to investigate possible violations of the BGEPA, and this is so whether they acted with or without the permission of tribal officials.

**2.     Whether the Initial Entry Into Defendant's Home Was Consensual**

"[A] warrantless entry does not run afoul of the Fourth Amendment if an officer obtains consent from a person who has 'mutual use of the property by virtue of joint access' or 'control for most purposes over it.'"   *United States v. Livingston*,  2011 WL 2678586 *1 (10th Cir. 2011) (quoting *United States v. Rith*, 164 F.3d 1323, 1329-30 (10th Cir. 1999)).  The Tenth Circuit Court of Appeals applies a two-part test for determining the voluntariness of consent:

> Under this test, the Government must: (1)"'proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given'"; and (2) "'prove that this consent was given without implied or express duress or coercion.'"

*United States v. Taverna*, 348 F.3d 873, 878  (10th Cir. 2003) (quoting *United States v. Sanchez*, 89 F.3d 715, 719 (10th Cir. 1996) (quoting *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996))). Here, the facts as found by the Court establish that Imogene Aguilar resided in the house in which  Defendant lived.  She therefore had actual authority to consent to entry into the common areas of the house.  *United  States v. Thompson*, 524 F.3d 1126, 1132 (10th Cir. 2008). The Court further concludes that under the totality of the circumstances as found by the Court reasonable officers in the special agents' position would have understood  Ms. Aguilar's gestures as evincing her unequivocal consent for the special agents to enter the family home for the

purpose of speaking with Defendant over the telephone.  The facts as found by the Court support

the further conclusions that her consent was freely and intelligently given, and refute any

suggestion of implied or express duress or coercion on the part of the special agents.

The Court rejects Defendant's argument  that Ms. Aguilar's consent was invalidated by

her subjective understanding that the special agents were conducting their investigation under

the imprimatur of the Governor of the Pueblo.  Based on her testimony at the evidentiary hearing

on Defendant's motion, the Court finds that Ms. Aguilar had precisely the opposite

understanding–*i.e.*, she believed that Special Agents Stanford and Riley were not present at her

house with the authority of the tribal Governor.  [Tr. 2/146/18-24]

**3.      Whether Defendant's Consent to the Interview with Special Agents Stanford and Riley at Sam's Club Was Invalidated by Defendant's Belief that Special Agents Stanford and Riley Were Acting at the Direction or with the Permission of the Governor of the Pueblo**

Defendant argues that "[d]uring his telephone conference with the Fish and Wildlife

Agents on the morning of February 12, [Defendant] was under the mistaken impression that,

because the Special Agents were present in the Pueblo, they must have had the permission of the

Governor and therefore [Defendant] was obligated by tribal law and custom to cooperate with

the Agent's [sic] investigation."  [Doc. 14 at 6]  Continuing this line of reasoning, Defendant

argues that "[s]till believing that the Special Agents were acting at the direction and under the

supervision of the Governor of Santo Domingo Pueblo, [Defendant] responded honestly to the

Agents' questions. . . ." [*Id.*]

The Court is persuaded by the testimony of various members of Kewa Pueblo that among

members of the Kewa Pueblo there is an established custom or tradition of deference to the

Governor, and that **if** Defendant believed that the special agents had been sent to his house at the

13

direction of the Governor, Defendant would have felt obligated to cooperate with the agents.  *Cf.* *United States v. Chalan*, 812 F.2d 1302, 1307 (10th Cir. 1987) (discussing relationship of tribal custom of respect for the governor of the Pueblo to question of whether tribe member was in custody for purposes of *Miranda* during interrogation in governor's office).  A more difficult factual question is whether Defendant in this case actually believed that the agents were present at his house at the Governor's direction or with his permission. Defendant conceded in his testimony at the evidentiary hearing that  the special agent he spoke to over the phone did not represent that he was there with the Governor's authority.  Defendant was aware from the February 10, 2010 meeting at the Governor's office that the Governor knew that Defendant had killed eagles on tribal land, and could have reasoned that the Governor, or someone acting on his behalf had informed the USFWS about Defendant's killing of eagles.  But Defendant would also have been aware that the matter seemed to have been resolved to the Governor's satisfaction during the meeting in the Governor's office, making it less likely that the Governor, or someone acting on his behalf, had reported Defendant to the USFWS.  The Court finds that when Defendant agreed to meet with the special agents at Sam's Club, Defendant was unsure whether the investigation by the USFWS had been instigated by the Governor or was being conducted with his approval.  The Court finds that Defendant's subjective concern that the special agents might be acting at the Governor's direction or with his consent contributed to Defendant's decision to meet with the special agents.

Ultimately, however, Defendant's reliance on his subjective state of mind is misplaced. "[P]olice may freely ask questions of any individual they choose . . . 'so long as the officers do not convey a message that compliance with their requests is required.'"  *United States v. Zapata*,

997 F.2d 751,  (10th Cir. 1993) (quoting  *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). In

determining whether the special agents seized Defendant by interviewing him at Sam's Club

> *the particular personal traits or subjective state of mind of the defendant . . .  are*
> *irrelevant to the legal question of whether a seizure has occurred by virtue of the*
> *police conduct involved.*  That inquiry is governed by *Bostick's* "reasonable
> person" test, which is clearly an objective test:  under the totality of the
> circumstances, would "the police conduct . . . have communicated to a reasonable
> person that the person was not free to decline the officers' requests or otherwise
> terminate the encounter." *Thus, [defendant's] own subjective  attitudes towards*
> *the police encounter, or any other of his particular personal attributes, are*
> *irrelevant, "other than to the extent that they may have been known to the officer*
> *and influenced his conduct."*

*Zapata*, 997 F.2d at 757 (emphasis added) (quoting *Bostick*, 501 U.S. at 439,  and *United States*

*v. Bloom*, 975 F.2d  1447, 1455 n.9 (10th Cir. 1992)).  Here, no evidence was proffered that

Special Agent Stanford or Special Agent Riley was aware of Defendant's concern that the

Governor had authorized the special agents to investigate Defendant's eagle hunting, and

accordingly, Defendant's subjective state of mind is irrelevant to the question of whether the

special agents seized Defendant by interviewing him at Sam's Club.  Based on the totality of the

circumstances, and applying an objective test, the Court concludes that Defendant's encounter

with the special agents at Sam's Club was at all times consensual and did not amount to a seizure

of Defendant's person. "It is well settled that consensual encounters between police officers and

individuals implicate no Fourth Amendment interests."  *United States v. Prince*, 593 F.3d 1178,

1185 (10th Cir. 2010).

**4.      Whether the Warrantless Seizure of  Eagle Feathers and Other Evidence Violated**
       **the Fourth Amendment**

"The Fourth Amendment generally prohibits the warrantless entry of a person's home,

whether to make an arrest or to search for specific objects.  The prohibition does not apply,

however, to situations in which voluntary consent has been obtained . . . from the individual whose property is searched. . . ."   *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citations omitted).  "The question of whether consent . . . was given voluntarily is one of fact to be determined from all the circumstances.  The burden of proving voluntariness is borne by the government."  *United States v. Abdenbi*, 361 F.3d 1282, 1287 (citations omitted) (10th Cir. 2004).   As previously noted, the Tenth Circuit Court of Appeals applies a two-part test for determining the voluntariness of consent:

> the Government must: (1)"'proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given'"; and (2) "'prove that this consent was given without implied or express duress or coercion.'"

*Taverna*, 348 F.3d at 878.  The Court concludes that under the totality of the circumstances as found by the Court, Defendant's words and conduct conveyed to an objective observer that he freely and intelligently gave his unequivocal consent to the special agents' entry into his home and to their examination of the eagle feathers.  The totality of the circumstances as found by the Court refutes any suggestion of implied or express duress or coercion on the part of the special agents.[6]  However, a question remains as to the coercive effect of Defendant's subjective concern that the special agents were acting at the direction or with the permission of  the Governor of the Pueblo, in which case by Kewa Pueblo custom and tradition he would have been obliged to cooperate with the special agents.  The present case is one in which "the matter of voluntariness will look somewhat differently depending on whether the focus is upon all the facts and

---

[6]The Court expressly rejects Defendant's proposed finding that upon arriving at Defendant's home on the afternoon of February 12, 2010 the special agents questioned Defendant in a "confrontational manner." [Doc. 44 at 9, ¶ 34]

circumstances known by the police at the time the consent was solicited, or instead upon all relevant facts as later determined and presented upon the motion to suppress." 4 Wayne R. LaFave, *Search and Seizure:  A Treatise on the Fourth Amendment* § 8.1(b) at 15 (4th ed. 2004). The opposite poles of judicial opinion on this issue are illustrated by *United States v. Elrod*,  441 F.2d 353. 355 (5th Cir. 1971) (observing that "[n]o matter how genuine the belief of the officers is that the consentor is apparently of sound mind, and deliberately acting, the search depending on his consent fails if it is judicially determined that he lacked mental capacity") and *United States v. Cedano-Medina*,  366 F.3d 682, 684-85 (8th Cir. 2004) ("In other words, a person can render a search legal by behaving in a way that would cause a reasonable person to believe that he or she has knowingly and voluntarily consented, whether or not the person actually intends to consent.  Thus, 'the Fourth Amendment requires only that the police reasonably believe the search to be consensual.'") (citations omitted). "[T]he apparent difference between the approaches to voluntary consent. . . stems from the weight to be accorded the evidence presented to a reasonable officer asking for consent as opposed to some other facts, unknown to the officer, but later argued to the reviewing court."  *United States v. Grap*,  403 F.3d 439, 444 (7th Cir. 2005) (rejecting *Elrod*). The Court has not found a clear expression of a preference for one approach over the other in our Tenth Circuit precedent.  In *United States v. Gay*, 774 F.2d 368, 377 (10th Cir. 1985), the Court of Appeals cited *Elrod* for the proposition that "one must know he is giving consent for the consent to be efficacious."  Significantly, the evidence that the Court of Appeals summarized in support of its conclusion that the defendant's consent was valid consisted of circumstances observable by the officers conducting the warrantless search in question. *Gay*, 774 F.2d at 377.  More recently, the Court of Appeals observed that "while 'a

person's subjective characteristics may be relevant to the voluntariness of the person's consent . .

. recent Supreme Court decisions cast doubt on this issue." *Zapata*, 997 F.2d at 759.  To further

complicate matters, there is tension between *Zapata*, which seems to this Court to say that "an

intangible characteristic," *id.*, such as "attitude toward authority" or "cultural heritage," *id.* n.6,

is of little or no relevance to the voluntariness inquiry, and an older case, *United States v.*

*Recalde*, 761 F.2d 1448, (10th Cir. 1985), which held that the defendant's life experience in

Argentina which had instilled in him "an acquiescence to police authority, " *id.* at 1454, "is

certainly relevant to the issue of coercion," *id.* Moreover, in deciding the related issue of the

*scope* of consent, the Court of  Appeals applies an objective standard by which the consenting

party's "subjective motivations are irrelevant." *United States v. Pikyavit*, 527 F.3d 1126, 1131-

32 (10th Cir. 2008). Likewise, as noted above,  in deciding whether a subject has consented to

speak to police, the Court of Appeals applies an objective standard of consent derived from the

Supreme Court's decision in *Bostick*. *Zapata*, 997 F.2d at 757.[7]

Lurking in the background is the Supreme Court's decision in *Colorado v. Connelly*, 479

U.S. 157 (1986), a case decided after *Recalde*.  Professor LaFave explains the problem thus:

> In *Schneckloth v. Bustamonte*, the Supreme Court's most detailed
> examination of the theoretical basis of the consent search concept . . .[t]he Court
> endorsed a process of "examining all the surrounding circumstances to determine
> if *in fact* the consent to search was coerced," and adopted  "the traditional
> definition of 'voluntariness'" as used in the pre-*Escobedo* confession cases.  Under
> this traditional view, any police questioning "which *in fact* produces a confession
> which is not the product of a free intellect renders that confession inadmissible."
> Thus, at the time of  *Schneckloth* it was clear that a confession taken from an
> insane person must be suppressed even if his interrogators reasonably believed
> him to be sane, and that the same was true of a confession obtained from a person

---

[7]There were two consent issues in *Zapata*: (1) whether the defendant consented to
questioning by a DEA agent and (2) whether the defendant consented to a search of his luggage.

18

who unknown to his questioners had received medication having the properties of a truth serum.  However, the Court more recently rejected that approach, ruling in *Colorado v. Connelly* that a confession is coerced *only* if there is "police conduct casually related to the confession" which is itself "coercive." Assuming that change in confession law is "read through" *Schneckloth* so as to now apply also to consent search cases, it would seem to require rejection of the *Elrod* approach (and very likely also the *Elrod* result).

LaFave, *supra*, at 17-18 (footnotes omitted);  *see also United States v. Sims*, 428 F.3d 945, 953 n.2 (10th Cir. 2005) (discussing unsettled relationship of *Connelly* to "the familiar 'totality of the circumstances' test articulated in *Bustamonte*").

The Court concludes that if the voluntariness of Defendant's consent is measured by an objective standard[8] limited to the what the special agents knew or should have known about Defendant's state of mind, Defendant's subjective concern that he might be acting contrary to the Governor's will if he declined to cooperate is irrelevant to the voluntariness inquiry due to the absence of evidence that the special agents knew or had reason to know of Defendant's subjective state of mind.  Alternatively, the Court concludes that if Defendant's unexpressed subjective concern is part of the "totality of the circumstances," it should not be given significant weight, *United States v. Iribe*, 11 F.3d 1553, 1557 (10th Cir. 1993), and that due to the absence of  evidence of coercion or duress on the part of the special agents, Defendant's subjective concern that a failure to cooperate with the special agents might be viewed as disrespect for the Governor is insufficient to render his consent involuntary.

**Seizure** of Items

---

[8]The Court  of Appeals has characterized this as a "police-perspective test."  *Sims*, 428 F.3d at 953 n. 2.

19

Although the Court has concluded that Defendant consented to the special agents' entry into his home and to their examination of the eagle feathers and rifle, the Court is not persuaded under the totality of the circumstances as found by the Court that Defendant consented to the seizure of these items.  The Court finds that Defendant signed the Abandonment Form and surrendered the items listed in the Abandonment Form in response to Special Agent Stanford's *prior* announcement that he and Special Agent Riley were going to seize them.  In other words, the Court finds that from an objective observer's perspective it was not a matter of Defendant being *asked* if he would give up the items; rather, it was a matter of  Defendant being *told* that the special agents were going to take the items.[9]  "[A]n individual's mere acquiescence to a claim of lawful authority is not, by itself, enough to show voluntary consent."  *Camfield v. City of Oklahoma City*,  248 F.3d 1214, 1233 (10th Cir. 2001).

The actual ground on which the specials agents seized the items appears to the Court to have been the plain view doctrine, whose clear applicability explains why Special Agent Stanford, knowing he did not have a warrant authorizing the seizure of the items, announced his intention to seize the items prior to asking Defendant to sign the Abandonment Form.  The plain view doctrine provides a "key" exception to the Fourth Amendment's warrant requirement. *United States v. Sparks*, 291 F.3d 683, 690 (10th Cir. 2002).  The plain vew doctrine validates

---

[9]The Court is aware that at the evidentiary hearing on his motion to suppress, Defendant testified that he "voluntarily" agreed that the agents could take away the eagle feathers. [Tr. 2/236/9-10]  This testimony was in response to a leading question and in a circumstance where the Court observed that the Defendant displayed a halting command of the English language.  In this instance, and with respect to his response that he "voluntarily" agreed that the items be taken, the Court finds that Defendant did not appear to have much, if any, understanding of the word "voluntarily" as a term of art in Fourth Amendment jurisprudence as it related to the matter of the actual seizure of the items.  The Court has given limited weight to Defendant's testimony that his consent to the seizure was voluntary.

warrantless seizures where three conditions are satisfied:  (1) the officer was lawfully in a position from which the item to be seized was in plain view; (2) it was immediately apparent that the item to be seized is contraband or evidence of a crime; and (3) the officer had a lawful right of access to the item.  *Id.*  In the present case, all three conditions were satisfied:  (1) Special Agents Stanford and Riley were present in Defendant's home with his consent where the eagle feathers and .22 rifle were in plain view, while the hawk was outside in plain view; (2) it was immediately evidence that the eagle feathers were contraband and evidence of a violation of the BGEPA, that the hawk carcass was contraband and possibly evidence of a violation of the Migratory Bird Treaty Act, and that the .22 rifle was evidence associated with the violation of the BGEPA; and (3) the special agents had a lawful right of access to the items.

**CONCLUSION**

In sum, the Court concludes that the special agents acted within their authority in entering the Pueblo and conducting their investigation.  They entered Defendant's house and viewed the eagle feathers and rifle with Defendant's consent.  They seized the eagle feathers, the .22 magnum rifle, and the hawk carcass under a lawful application of the plain view doctrine.

For the foregoing reasons, Defendant's motion to suppress will be denied.

**IT IS THEREFORE HEREBY ORDERED**  that Defendant 's Motion to Suppress [Doc. 14] **be and hereby is denied**.

**So ordered this 7th day of November, 2011.**

M. CHRISTINA ARMIJO
UNITED STATES DISTRICT JUDGE